**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **3C CONSULTING, LLC** | ) | **Case No.:** |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **JEFF REHBERGER and** | ) | |
| **FORTUNATE SON PARTNERS, LLC** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

The Plaintiff, 3C CONSULTING, LLC (hereinafter referred to as "Plaintiff" or "3C"), by and through their undersigned counsel, COLE SADKIN, LLC, file this Complaint against the Defendants, JEFF REHBERGER (hereinafter "Rehberger") and FORTUNATE SON PARTNERS, LLC (hereinafter "Fortunate") (collectively referred to as "Defendants"), and allege, as follows:

### JURISDICTIONAL ALLEGATIONS

1. This is a civil action against the Defendants for breach of contract, trademark infringement, counterfeiting, and false designation of origin/unfair competition under the Lanham Act (15 U.S.C. §1501 *et. seq.* ) and copyright infringement under the Copyright Act (17 U.S.C. §602).

2. This Court has subject matter jurisdiction over the claims in this action that relate to trademark infringement, counterfeiting, false designation of origin/unfair competition and copyright infringement pursuant to the provisions of 15 U.S.C. §1221 and 28 U.S.C. §§ 1331 and 1338(a).

3. This Court has personal jurisdiction over the Defendants because JEFF
   REHBERGER resides in Illinois, and FORTUNATE SON PARTNERS, LLC
   is incorporated in and has its principal place of business in Illinois, and the
   Defendants regularly conduct and solicit business in the State of Illinois.

## VENUE

4. Venue is proper in this district under 28 U.S.C. §1391(b) in that the
   Defendants reside in this district, a substantial part of the events or omissions
   giving rise to the claim occurred in this district, and the Defendants are subject
   to personal jurisdiction in this Judicial District with respect to this action, and
   there is no other district in which the action may otherwise be brought.

## PARTIES

5. 3C CONSULTING, LLC (hereinafter referred to as "3C") is a Colorado
   limited liability corporation and has its principal place of business at 1001
   Bannock St, Suite # 419 in Denver, Colorado 80204.

6. FORTUNATE SON PARTNERS, LLC is incorporated in Illinois, and has its
   principal place of business at 701 Laurel St, Highland, Illinois 62249.
   FORTUNATE SON PARTNERS, LLC has engaged in the offer in the use of
   the intellectual property that 3C created without 3C's permission.

7. At all times material to this Complaint, REHBERGER owned, managed,
   and/or operated FORTUNATE SON PARTNERS, LLC, and regularly
   exercised the authority to use the intellectual property of 3C to help grow its
   business relationships, to hire and fire employees, and controlled the finances
   and operations of FORTUNATE SON PARTNERS, LLC.

## FACTS COMMON TO ALL COUNTS

8.  On October 23, 2019 REHBERGER contracted with 3C to provide certain consulting services related to Illinois Cannabis dispensary license applications as fully described in the terms of a Master Services Agreement (MSA) for ten applications initially.  A copy of the *Master Services Agreement* is attached as **Exhibit A**.

9.  Pursuant to Section 4.1 regarding the Ownership of Work Product, 3C "shall retain all right, title and interest now existing or that may exist in the future in and to any Intellectual Property of Consultant or any document, development, work product, know-how, design, processes, invention, technique, trade secret, or idea, and all intellectual property rights related thereto, that has previously been created by Consultant, is created by Consultant to which Consultant contributes, or which relates to Consultant's Services provided pursuant to this Agreement (collectively, the "Work Product"), including all copyrights, trademarks, and other intellectual property rights (including but limited to patent rights) relating thereto.  Company agrees that any and all Work Product shall be and remain the property of Consultant."  *See* Master Services Agreement Section 4.1.

10. Upon information and belief, REHBERGER and his company FORTUNATE used the Work Product from the October 2019 contract to file additional cannabis applications derived therefrom for himself, his company, other individuals and other entities.

11. Upon information and belief, REHBERGER and his company FORTUNATE

3

continue to use the Work Product to continue to file additional cannabis applications derived therefrom for himself, his company, other individuals and other entities.

12. REHBERGER and his company FORTUNATE's actions has resulted in and will continue to cause irreparable injury to 3C's business, including, but not limited to loss of sales, profits, business reputation and goodwill.

13. Due to the actions of the Defendants, the Plaintiff has been forced to retain the undersigned counsel, and the Defendants are responsible for paying the reasonable costs of the action.

14. The Defendants' acts have damaged, and will continue to damage the Plaintiff, and the Plaintiff have no adequate remedy at law.

15. The Defendants' wrongful acts will continue unless enjoined by the Court. Accordingly, the Defendants must be restrained and enjoined from any further counterfeiting or infringement of Plaintiff's protected Work Product.

**Count One**

**Breach of Contract**

16. 3C repeats and realleges paragraphs 1 through 15 hereof, as if fully set forth herein.

17. The contract between 3C, REHBERGER and FORTUNATE is valid and enforceable.

18. Pursuant to the terms of the contract, REHBERGER and FORTUNATE were supposed to use the Work Product created by 3C for ten applications they contracted with 3C to create.

19. The Defendants have breached the contract by using the Work Product created by 3C, without authorization from the Plaintiff, to file additional cannabis applications and more than the ten applications contracted with 3C to create.

20. The Defendants' use of the Work Product created by 3C has resulted in lost profits to the Plaintiff to be proven at trial as it is accruing as the Defendants continue to use the Work Product.

21. By reason of the foregoing, 3C is entitled to lost profits from the additional applications created with the Work Product, among other relief, injunctive relief, an award of statutory damages, and costs of the action together with pre-judgment and post-judgment interest as well as attorneys' fees.

**Count Two**

**Federal Trademark Counterfeiting and Infringement, 15 U.S.C. §1114**

22. 3C repeats and realleges paragraphs 1 through 15 hereof, as if fully set forth herein.

23. 3C is the owner of all of the Work Product created by 3C for the cannabis applications.

24. The Defendants, without authorization from the Plaintiff, have used the Plaintiff's intellectual property in commerce.

25. The Defendants' conduct as alleged herein is willful and is intended to, and is likely to, cause confusion, mistake, or deception as to the affiliation, connection, or association of FORTUNATE, with the Plaintiff.

26. REHBERGER actively, knowingly, and intentionally adopted and used the intellectual property with the intent to trade on the Work Product for cannabis

applications and divert potential business from the Plaintiff.

27. REHBERGER's acts were a moving, active, and conscious force behind FORTUNATE's infringement.

28. REHBERGER personally engaged in tortious conduct within the state of Illinois.

29. The Defendants' acts constitute willful trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §114.

30. The Defendants' use in commerce the Work Product created by 3C has resulted in lost profits to the Plaintiff to be proven at trial as it is accruing as the Defendants continue to use the Work Product.

31. By reason of the foregoing, Plaintiff is entitled to lost profits from the additional applications created with the Work Product, among other relief, injunctive relief, an award of statutory damages, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest as well as attorneys' fees.

### Count Three

### Federal Trademark Counterfeiting 15 U.S. C. §1116(d)

32. 3C repeats and realleges paragraphs 1 through 15 hereof, as if fully set forth herein.

33. 3C is the owner of all of the Work Product created by 3C for the cannabis applications.

34. The Defendants, without authorization from the Plaintiff, have used the Plaintiff's intellectual property in commerce.

35. The Defendants' conduct as alleged herein is willful and is intended to, and is likely to, cause confusion, mistake, or deception as to the affiliation, connection, or association of FORTUNATE, with the Plaintiff.

36. REHBERGER actively, knowingly, and intentionally adopted and used the intellectual property with the intent to trade on the Work Product for cannabis applications and divert potential business from the Plaintiff.

37. REHBERGER's acts were a moving, active, and conscious force behind FORTUNATE's infringement.

38. REHBERGER personally engaged in tortious conduct within the state of Illinois.

39. The Defendants' acts constitute willful trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1116(d)(1)(B).

40. The Defendants' use in commerce the Work Product created by 3C has resulted in lost profits to the Plaintiff to be proven at trial as it is accruing as the Defendants continue to use the Work Product.

41. By reason of the foregoing, Plaintiff is entitled to lost profits from the additional applications created with the Work Product, among other relief, injunctive relief, an award of statutory damages, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest as well as attorneys' fees.

**Count Four**

**Federal False Designation of Origin and Unfair Competition, 15 U.S.C. §1125(a)**

42. 3C repeats and realleges paragraphs 1 through 15 hereof, as if fully set forth

herein.

43. 3C is the owner of all of the Work Product created by 3C for the cannabis applications.

44. The Defendants, without authorization from the Plaintiff, have used the Plaintiff's intellectual property in commerce.

45. The Defendants' conduct as alleged herein is willful and is intended to, and is likely to, cause confusion, mistake, or deception as to the affiliation, connection, or association of FORTUNATE, with the Plaintiff.

46. REHBERGER actively, knowingly, and intentionally adopted and used the intellectual property with the intent to trade on the Work Product for cannabis applications and divert potential business from the Plaintiff.

47. REHBERGER's acts were a moving, active, and conscious force behind FORTUNATE's infringement.

48. REHBERGER personally engaged in tortious conduct within the state of Illinois.

49. The Defendants' acts constitute willful trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1116(d)(1)(B).

50. The Defendants' use in commerce the Work Product created by 3C has resulted in lost profits to the Plaintiff to be proven at trial as it is accruing as the Defendants continue to use the Work Product.

51. By reason of the foregoing, Plaintiff is entitled to lost profits from the additional applications created with the Work Product, among other relief, injunctive relief, an award of statutory damages, and costs of the action under

Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest as well as attorneys' fees.

## Count Five

## Copyright Infringement (17 U.S.C. §501)

52. 3C repeats and realleges paragraphs 1 through 15 hereof, as if fully set forth herein.

53. 3C is the owner of all of the Work Product created by 3C for the cannabis applications.

54. The Defendants, without authorization from the Plaintiff, have used the Plaintiff's intellectual property in commerce.

55. The Defendants' conduct as alleged herein is willful and is intended to, and is likely to, cause confusion, mistake, or deception as to the affiliation, connection, or association of FORTUNATE, with the Plaintiff.

56. REHBERGER actively, knowingly, and intentionally adopted and used the intellectual property with the intent to trade on the documents for cannabis applications and divert potential business from the Plaintiff.

57. REHBERGER's acts were a moving, active, and conscious force behind FORTUNATE's infringement.

58. REHBERGER personally engaged in tortious conduct within the state of Illinois.

59. The Defendants' acts constitute a willful copyright infringement in violation of the Copyright Act, 17 U.S.C. §501.

60. The Defendants' use in commerce the Work Product created by 3C has

resulted in lost profits to the Plaintiff to be proven at trial as it is accruing as the Defendants continue to use the Work Product.

61. By reason of the foregoing, Plaintiff is entitled to lost profits from the additional applications created with the Work Product, among other relief, injunctive relief, an award of statutory damages, and costs of the action under the Copyright Act, 15 U.S.C. §§ 502, 504 and §505, together with prejudgment and post-judgment interest as well as attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, 3C CONSULTING, LLC, respectfully request the following relief against the Defendants as follows:

1. With regard to Plaintiff's breach of contract claim:

   a. An award of economic and compensatory damages to Plaintiffs and against Defendants for the total amount of lost profits to be determined at trial;

2. With regard to Plaintiffs' claim for trademark infringement:

   a. Statutory damages under 15 U. S. C. § 1117(c) in the amount of $30,000.00;

   b. Costs of suit;

   c. Attorneys' fees;

   d. Joint and several liability for REHBERGER, and other officers, and directors for the knowing participation in the counterfeiting activities of FORTUNATE;

3. With regard to Plaintiff's claim for counterfeiting:

   a. Statutory damages under 15 U. S. C. § 1117 (c)in the amount of

$30,000.00;

b. Costs of suit;

c. Attorneys' fees;

d. Joint and several liability for REHBERGER, and other officers, and directors for the knowing participation in the counterfeiting activities of FORTUNATE;

4. With regard to Plaintiff's claim for false designation and unfair competition:

a. Statutory damages under 15 U. S. C. § 1117(c) in the amount of $30,000.00;

b. Costs of suit;

c. Attorneys' fees;

d. Joint and several liability for REHBERGER, and other officers, and directors for the knowing participation in the counterfeiting activities of FORTUNATE;

5. With regard to Plaintiff's claim for copyright infringement:

a. Statutory damages under 17 U.S.C. §504 (c) in the amount of $30,000.00;

b. Costs of suit;

c. Attorneys' fees;

d. Joint and several liability for REHBERGER, and other officers, and directors for the knowing participation in the counterfeiting activities of FORTUNATE;

6. Pursuant to 15 U.S.C. §1116(a) and 17 U.S.C. §504, directing FORTUNATE to

file with the Court and serve on the Plaintiff within thirty (30) days after issuance of an injunction, a report in writing and under oath setting forth in detail the manner and form in which FORTUNATE has complied with the injunction;

7. For an order from the Court requiring that FORTUNATE provide complete accountings and for equitable relief, including that FORTUNATE disgorge and return or pay their ill-gotten gains obtained from the illegal transactions entered into and/or pay restitution, including the amount of monies that should have been paid if FORTUNATE had complied with their legal obligations, or as equity requires.

8. For an order from the Court that an asset freeze or constructive trust be imposed on all monies and profits in FORTUNATE's possession, which rightfully belong to the Plaintiff;

9. Pursuant to 15 U.S.C. § 1118 and 17 U.S.C. § 503, requiring that FORTUNATE and all others acting under FORTUNATE's authority, at its cost, be required to deliver up to Plaintiff for destruction of all copies of Work Product prepared by 3C.

10. For treble damages suffered by the Plaintiffs as a result of the willful and intentional infringements engaged in by FORTUNATE, under 15 U.S.C. §1117(b);

11. For all costs of suit;

12. For attorneys' fees;

13. For such other and further relief as the Court may deem just and equitable.

Dated: September 13, 2021

Respectfully Submitted,


By:  /s/ Vani Vedam
             Vani Vedam


COLE SADKIN, LLC
Mason S. Cole
Dean J. Tatooles
Vani Vedam
Mark Johnson
1652 W. Belmont, Suite 1
Chicago, Illinois 60657
(312) 548-8610
mcole@colesadkin.com
vvedam@colesadkin.com
Counsel for Plaintiff
ARDC No. 6287597

# **EXHIBIT A**

DocuSign Envelope ID: 392E9563-AE24-468B-9A5B-7CDCA85335BE



# MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (this "Agreement") is entered into as of __10/23/2019__ (the "Effective Date"), by and between Jeff Rehberger through TBF Entity (hereinafter "Company") and 3C Consulting, LLC, a Colorado limited liability company (hereinafter "Consultant"). Company and Consultant are sometimes hereinafter referred to collectively as the "Parties", and individually as a "Party".

Company desires Consultant to perform certain services from time to time relating to, among other things, cannabis or hemp consulting, all upon the terms and conditions set forth in this Agreement.

The Parties, intending to be legally bound, hereby agree as follows:

1. DEFINITIONS. Capitalized words used but not otherwise defined in this Agreement shall have the definitions given below:

    1.1 "Affiliate" means any individual or entity, whether now or hereafter existing, which directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the Company (including, without limitation, joint ventures, limited liability companies, and partnerships). As used in this definition, the term control shall mean ownership of 50% or more of the total combined voting power or value of all classes of shares or interests in the entity, or the power to direct the management and policies of the entity, by contract or otherwise.

    1.2 "Confidential Information" means all information, including any Intellectual Property (as defined below) to the extent applicable, disclosed by one Party to the other Party pursuant to Services (as defined below) provided under this Agreement that is not generally known in the Company or Consultant's trade or industry and shall include, without limitation, (a) concepts and ideas relating to the development and distribution of content in any medium or to the current, future and proposed products or services of the Parties or their subsidiaries or affiliates; (b) trade secrets, drawings, inventions, know-how, software programs, and software source documents; (c) information regarding plans for research, development, new service offerings or products, marketing and selling, business plans, business forecasts, budgets and unpublished financial statements, licenses and distribution arrangements, prices and costs, suppliers and customers; and (d) any information regarding the skills and compensation of employees, contractors or other agents of the Parties or their subsidiaries or affiliates. Confidential Information also includes proprietary or confidential information of any third party who may disclose such information to Company or Consultant in the course of the performance of Services hereunder.

    1.3 "Consultant Deliverables" has the meaning(s) set forth in the applicable Statement(s) of Work attached to and incorporated into this Agreement.

    1.4 "Intellectual Property" includes, without limitation, any inventions, technological

innovations, discoveries, designs, formulas, know-how, processes, business methods, patents, trademarks, service marks, copyrights, computer software, ideas, creations, writings, illustrations, photographs, scientific and mathematical models, improvements to all such property, and all recorded material defining, describing, or illustrating all such property, whether in hard copy or electronic form.

     1.5     "Licensed Purpose" has the meaning(s) set forth in the applicable Statement(s) of Work attached to and incorporated into this Agreement.

     1.6     "Services" has the meaning(s) set forth in the applicable Statement(s) of Work attached to and incorporated into this Agreement.

    2.     SERVICES AND RESPONSIBILITIES.

     2.1     Services.  Consultant will provide certain consulting services to Company within Consultant's area of expertise, including but not limited to, business development, strategy, and compliance. From time to time, Company and Consultant may enter into one or more written work orders substantially in the form attached hereto as Exhibit A that contain the terms for Services and items Company desires Consultant to provide. Such work order will set forth, to the extent applicable, among other things, scope of Services, schedule for completion of Services, various project activities, and tasks to be performed by the Parties, Consultant Deliverables, and roles and responsibilities of the Parties. Upon acceptance of a work order by Consultant, whether in writing, by performance, or otherwise, such work order will be a "Statement of Work". Each Statement of Work will become effective only when executed by Parties, and will thereafter become a part of this Agreement as if fully set forth herein. If any provision of the applicable Statement of Work is inconsistent with this Agreement prior to such incorporation, the terms of the applicable Statement of Work will control, but only with respect to the Services to be performed under said Statement of Work. The manner and means that Consultant chooses to complete the Services are in Consultant's sole discretion and control. In completing the Services, Consultant agrees to provide its own equipment, tools, and other materials at its own expense; however, Company will make its facilities and equipment available to Consultant to the extent necessary.

     2.2     Change Orders.  Company may, from time to time, request changes or additions to the Services, including to any Consultant Deliverable, performed or to be performed by Consultant under an existing Statement of Work. Upon any such request, if such a request is accepted by Consultant in its sole discretion, Consultant will provide Company with a written change order proposal for the additional Services, including any resulting change in the fees, scope of Services, schedule of Services and payment schedule, and responsibilities of the Parties. Any change order proposal shall be deemed a "Change Order" upon acceptance by the Parties and shall be attached to and incorporated into the applicable Statement of Work. Change Orders shall be effective only upon execution by both Parties, and shall thereafter be attached to and incorporated into the applicable Statement of Work and this Agreement. If any provision of the applicable Change Order is inconsistent with the Statement of Work to which it refers or this Agreement prior to such incorporation, the terms of the applicable Change Order will control, but only with respect to the Services to be performed under said Change Order. Company acknowledges and agrees that the time in which Consultant is required to perform the Services may need to be extended as a result of a Change Order and that such extension shall not be attributed to Consultant and, to the extent any Statement of Work is impacted by a Change Order, the Parties will adjust the Statement of Work, including timelines to account for the increased time needed to perform the Services

2

thereunder.

2.3    <u>Company Responsibilities</u>.  In connection with Consultant's performance of the Services and the development of the Consultant Deliverables, Company shall perform certain tasks, provide certain information, and fulfill certain responsibilities as further set forth in the applicable Statement of Work, or as otherwise reasonably requested by Consultant from time to time ("<u>Company Responsibilities</u>"). Company acknowledges that it will provide Consultant reasonable access to Company's subject matter resources as part of Consultant's performance of the Services and creation of the Consultant Deliverables. Company understands that Consultant's performance is dependent on the Company's timely and effective performance of Company Responsibilities under this Agreement and each applicable Statement of Work. Consultant shall be excused from any failure or delay in performing the Services (including delivering any Consultant Deliverables) to the extent caused by the Company's failure to timely fulfill Company Responsibilities. Company shall be responsible for (i) ensuring that the scope of Services and Consultant Deliverables meet Company's requirements; (ii) ensuring Company's compliance with all applicable federal, state and local laws and regulations, (iii) assigning a single point of contact for all inquiries during the performance of Services, (iv) providing clarification for all inquiries raised by Consultant within two (2) business days, (v) carrying out testing and providing feedback to Consultant, and (vi) obtaining all necessary consents from third parties that are required for Consultant to use Company information, content or software in connection with Consultant's performance of the Services under this Agreement or any applicable Statement of Work.

3.      COMPENSATION AND BILLING.

3.1    <u>Project Fees and Reimbursable Items</u>.  Company shall pay to Consultant fees and other compensation set forth in all applicable Statements of Work. Company will also reimburse Consultant for all reasonable out-of-pocket travel, living and other ancillary expenses paid or incurred by Consultant while away from the principal place(s) of the business of Consultant in connection with the Services and any other reimbursable items set forth in each Statement of Work. Consultant will have no obligation to perform any Services when any amount required to be paid by Company remains due and unpaid beyond the date such amount is due. Any suspension of Services by Consultant as a result of Company's failure to make payment as required will extend the due dates of Consultant Deliverables and other Services to the extent impacted by such suspension or delay.

3.2    <u>Invoicing and Payments</u>.  Any and all fees and other compensation payable to Consultant as set forth in any applicable Statements of Work shall be due and payable as set forth therein. In addition, the Company will reimburse Consultant, without deduction or setoff, for all fees, charges, travel, lodging and other out-of-pocket expenses incurred incident to its performance of Services, within five (5) days after submission of an invoice by Consultant to Company, which invoice will contain copies of all original receipts or similar documentation. In the event Consultant deems it necessary or advisable to employ third-party consultants or others in connection with the Services, it shall so notify Company, and upon Company's approval, the Company shall pay the entire cost of such third-party. In the event Company fails to make a payment for more than thirty (30) days following the date of any invoice, Company will pay interest at a rate equal to the lesser of 1% per month (or part thereof) or the maximum legal rate permitted, on the amount shown on such invoice.

3.3    <u>Taxes</u>.  Company shall be responsible for any and all federal, state or local sales, use, excise, privilege or other taxes or assessments, however designated or levied, relating to any amounts payable by Company to Consultant hereunder, this Agreement or any Services, exclusive of taxes based

3

on Consultant's net income or net worth. Consultant will invoice Company for any taxes payable by Company that are required to be collected by Consultant pursuant to any applicable law, rule, regulation or other requirements of law. Consultant is an independent contractor, therefore, Company will not withhold or pay those amounts an employer is typically required to withhold or pay in connection with wages paid to an employee, such as income tax, social security, Medicare, or disability.

4.      INTELLECTUAL PROPERTY.

    4.1      <u>Ownership of Work Product</u>.  Consultant shall retain all right, title and interest now existing or that may exist in the future in and to any Intellectual Property of Consultant or any document, development, work product, know-how, design, processes, invention, technique, trade secret, or idea, and all intellectual property rights related thereto, that has previously been created by Consultant, is created by Consultant, to which Consultant contributes, or which relates to Consultant's Services provided pursuant to this Agreement (collectively, the "Work Product"), including all copyrights, trademarks and other intellectual property rights (including but not limited to patent rights) relating thereto. Company agrees that any and all Work Product shall be and remain the property of Consultant. Company agrees to execute, at Consultant's request and expense, all documents and other instruments necessary or desirable to confirm such ownership of Work Product. In the event that Company does not, for any reason, execute such documents within a reasonable time of Consultant's request, the Company hereby irrevocably appoints Consultant as Company's attorney-in-fact for the purpose of executing such documents on Company's behalf, which appointment is coupled with an interest. Company shall not attempt to register any works created by Consultant pursuant to this Agreement at the U.S. Copyright Office, the U.S. Patent & Trademark Office, or any foreign copyright, patent, or trademark registry. Company retains no rights in the Work Product and agrees not to challenge Consultant's ownership of the rights embodied in the Work Product. Company further agrees to assist Consultant in every proper way to enforce Consultant's rights relating to the Work Product in any and all countries, including, but not limited to, executing, verifying and delivering such documents and perform such other acts (including appearing as a witness) as Consultant may reasonably request for use in obtaining, perfecting, evidencing, sustaining, and enforcing Consultant's rights relating to the Work Product.

    4.2      <u>Company Intellectual Property</u>.  Company (or its licensor) will at all times retain all rights, ownership, and interest in and to any Intellectual Property utilized by Consultant in the performance of the Services which was or is originated, developed, purchased or licensed by the Company or its Affiliates, together with any and all additions, enhancements, improvements or other modifications thereto made by Company, its Affiliates or by any third party on behalf of Company and not in connection with this Agreement, and without regard to whether the same took place during or prior to the performance of the Services under this Agreement (collectively, "Company Intellectual Property"). Nothing contained in this Agreement or otherwise shall be construed to grant to Consultant any right, title, license or other interest in, to or under any Company Intellectual Property (whether by estoppel, implication or otherwise), except the right and license to modify and otherwise use such items for the performance of the Services hereunder.

    4.3      License.

        (a)      Subject to Section 4.3(b) and Company's receipt of payment as set forth in Section 3, Consultant grants to Company a non-exclusive, perpetual, irrevocable, non-transferable and non-sublicensable right and license to use the Work Product, including without limitation, any reports,

4

proposals, lists, technical materials, business or technical processes, Services, and Consultant Deliverables, provided by Consultant to Company in connection with the Services for the Licensed Purpose. Notwithstanding the foregoing, the Company acknowledges that the license granted by Consultant in this Section 4.3 is transferable only to an Affiliate and only in connection with an assignment of this Agreement by Company in accordance with Section 12. For the avoidance of doubt, the license does not include the right to use, sell, or sub-license any Work Product comprising the license and may only be used, whether or not transferred, for the Licensed Purpose

(b)     Company agrees, on its own behalf and on behalf of its owners, officers, directors, employees and Affiliates, that the Confidential Information and Work Product provided by Consultant in the course of performing the Services shall be used by Company solely for the Licensed Purpose, and for no other purpose, including without limitation (i) providing services to any other entity or individual, including any Affiliate, except in connection with an assignment of this Agreement in accordance with Section 12, or (ii) using any such Confidential Information or Work Product in any external reports, except as necessary to accomplish the Licensed Purpose. Company shall not utilize the Work Product without any copyright notices or in any format other than the full and complete format in which Company received such Work Product from Consultant, except in connection with the Licensed Purpose.

5.     CONFIDENTIAL INFORMATION.

5.1     Each of the Parties hereto agrees to hold the other Party's Confidential Information (as defined below) in strict confidence and not to disclose such Confidential Information to any third parties. Each Party also agrees not to use any of the other Party's Confidential Information for any purpose other than in conjunction with the performance of Services by Consultant and use of said Services by Company.

5.2     Each Parties' obligations set forth in this Section 5 shall not apply with respect to any portion of the Confidential Information that the other Party can document by competent proof that such portion: (i) is in the public domain through no fault of the other Party; (ii) has been rightfully independently communicated to the other Party free of any obligation of confidence; or (iii) was developed by the other Party independently of and without reference to any information communicated by one Party to the other Party. In addition, either Party may disclose Confidential Information in response to a valid order by a court or other governmental body, as otherwise required by law, provided such Party first provides advanced written notice of the same to the other Party. All Confidential Information furnished a Party is the sole and exclusive property of the disclosing Party or its suppliers or customers. Upon request by either disclosing Party, the receiving Party agrees to promptly deliver to the disclosing Party the original and any copies of such Confidential Information. At the disclosing Party's option, the receiving Party shall provide written certification of its compliance with this Section 5.

5.3     Notwithstanding anything contained in Section 4.1 or this Section 5 to the contrary, the Parties agree and acknowledge that Consultant provides advisory services to businesses which may compete with Company or are otherwise involved in a similar industry or line of business, and that Consultant's expertise, knowledge, and knowhow are evolving assets that shall in no way be compromised hereby. Company acknowledges and agrees that: (i) the Consultant shall not be restricted in its ability to use Work Product, including without limitation, any concepts, processes, ideas and programs developed in connection with the Services, and any generalized ideas, concepts, know-how, methods, techniques or skills gained or learned during the performance of Services, with third-party clients, and (ii) Consultant may represent, perform services for, or be employed by such other clients, persons, or

5

DocuSign Envelope ID: 397E9563-A524-4688-9A5E-7DDCA85335BF

companies as Consultant sees fit in its sole discretion.

5.4     Subject to Section 4.3, upon any termination or expiration of this Agreement, each Party (i) shall immediately discontinue all use of the other Party's Work Product or Confidential Information delivered under this Agreement; (ii) shall delete any such Work Product or Confidential Information of the other Party from such Party's computer storage or any other media, including, but not limited to, online and off-line libraries; and (iii) shall return to the other Party, or, at the other Party's option, destroy, all copies of such Work Product or Confidential Information then in such Party's possession. In the event either Party terminates this Agreement, the Consultant will be entitled to payment for Services performed as of the date of termination and shall not receive any additional consulting fees or other compensation.

6.      REPRESENTATIONS AND WARRANTIES; DISCLAIMER.

6.1     Consultant represents and warrants that: (a) Consultant has the full right and authority to enter into this Agreement and perform its obligations hereunder; (b) Consultant has the right and unrestricted ability to license the Work Product to Company as set forth in Section 4.3 (including the right to license any Work Product created by Consultant's employees or contractors); (c) to Consultant's actual knowledge, the Work Product will not infringe upon any copyright, patent, trademark, right of publicity or privacy, or any other proprietary right of any person, whether contractual, statutory or common law. Consultant agrees to indemnify Company from any and all damages, costs, claims, expenses or other liability (including reasonable attorneys' fees) arising from or relating to the breach or alleged breach by Consultant of the representations and warranties set forth in this Section 6.1.

6.2     Company represents and warrants that: (a) Company has the full right and authority to enter into this Agreement and perform its obligations hereunder; (b) Company has the full right to neither Company nor any of Company's owners, officers, directors, agents, employees, and Affiliates, will infringe upon any copyright, patent, trademark, right of publicity or privacy, or any other proprietary right of any person, whether contractual, statutory or common law. Company agrees to indemnify Consultant from any and all damages, costs, claims, expenses or other liability (including reasonable attorneys' fees) arising from or relating to the breach or alleged breach by Company of the representations and warranties set forth in this Section 6.2.

6.3     EXCEPT AS SET FORTH IN SECTION 6.1, CONSULTANT MAKES NO REPRESENTATIONS OR WARRANTIES TO COMPANY, EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO ANY SERVICES OR CONSULTANT DELIVERABLES PROVIDED HEREUNDER OR PURSUANT TO ANY STATEMENT OF WORK, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. ALL OTHER WARRANTIES ARE HEREBY DISCLAIMED. FURTHERMORE, EXCEPT AS SET FORTH IN SECTION 6.1, CONSULTANT DOES NOT MAKE, AND HEREBY DISCLAIMS, ANY GUARANTEE ABOUT THE SPECIFIC OUTCOMES OF THE SERVICES OR THE USE OF THE CONSULTANT DELIVERABLES. COMPANY, ON BEHALF OF ITSELF AND ITS AFFILIATES, ACKNOWLEDGES AND AGREES THAT CONSULTANT, IN ITS PERFORMANCE OF SERVICES, IS NOT ACTING, IN ANY CAPACITY, AS AN ATTORNEY OR OFFERING LEGAL ADVICE TO COMPANY AND THAT ALL SERVICES PERFORMED BY CONSULTANT ARE BASED SOLELY ON CONSULTANT'S GENERAL EXPERIENCE IN THE INDUSTRY.

7.      INDEPENDENT CONTRACTOR STATUS; TAX TREATMENT.

6

7.1     Consultant is an independent contractor and not an employee of Company. Nothing in this Agreement is intended to, or should be construed to create a partnership, agency, joint venture or employment relationship. The manner and means by which Consultant chooses to complete the consulting services are in Consultant's sole discretion and control. Consultant is not authorized to make any representation, contract, or commitment on behalf of Company or incur any liabilities or obligations of any kind in the name of or on behalf of Company. Any persons employed by or subcontracting with Consultant to perform any part of Consultant's obligations hereunder shall be under the sole control and direction of Consultant. Company shall have no right or authority with respect to the selection, control, direction, or compensation of such persons.

7.2     Consultant and Company agree that Company will treat Consultant as an independent contractor for purposes of all tax laws (local, state and federal) and file forms consistent with that status. Consultant will be solely responsible to pay any and all local, state, and/or federal income, social security and unemployment taxes for Consultant and its employees. Company will not withhold any taxes or prepare W-2 Forms for Consultant, but will provide Consultant with a Form 1099, if required by law. No part of Consultant's compensation will be subject to withholding by Company for the payment of any social security, federal, state or any other employee payroll taxes.

8.     TERM.

8.1     <u>Term</u>. The term of this Agreement shall commence as of the Effective Date and shall continue until the later of (i) the first anniversary of the Effective Date, or (ii) the expiration or earlier termination of any Statement of Work for which Services to be performed thereunder remain outstanding.

8.2     <u>Termination.</u> This Agreement may be terminated by either Party (the "<u>Non-Defaulting Party</u>") if any of the following events occur by or with respect to the other Party (the "<u>Defaulting Party</u>"): (i) the Defaulting Party commits a material breach of any of its obligations hereunder and fails to cure such breach within the time period set forth in Section 8.3 hereof; or (ii) any insolvency or filing of a petition in bankruptcy by or against the Defaulting Party, any appointment of a receiver for the Defaulting Party, or any assignment for the benefit of the Defaulting Party's creditors.

8.3     <u>Cure and Remedies</u>. In the event either Party commits a material breach of any of its obligations hereunder, the Non-Defaulting Party will so notify the Defaulting Party in writing (and, in such notice, indicate the nature of the breach and the assertion of the Non-Defaulting Party's right to terminate). The Defaulting Party will thereafter have thirty (30) days (or ten (10) days in the case of payment of monies due) following receipt of such notice to cure such breach or, if such breach cannot be reasonably cured in thirty (30) days, such longer period of time as may be reasonably necessary to effect such cure if the Defaulting Party furnishes to the Non-Defaulting Party within such thirty (30) day period a plan demonstrating that it is capable of curing the breach and thereafter diligently proceeds to prosecute such plan to completion. If such breach remains uncured after such cure period, the Non-Defaulting Party may terminate this Agreement pursuant to Section 8.2 effective immediately upon delivery of further notice to such effect. Notwithstanding the foregoing, in the event Company fails to make payment of any monies due under this Agreement within ten (10) days following receipt of notice as provided above, the Consultant shall have the option, upon written notice of the same, to suspend the performance of any Services hereunder until such time as Consultant receives payment in full therefor. Consultant's option to suspend performance of Services shall not otherwise affect Consultant's rights to thereafter terminate this Agreement in accordance with this Section 8.

7

8.4     Effect of Termination.

(a)     In the event Consultant terminates this Agreement pursuant to this Section 8, Consultant will be entitled to payment for all Services rendered through the date of termination (including for work-in-progress), those costs reasonably incurred in anticipation of performance of the Services to the extent they cannot reasonably be eliminated, any other reasonable termination costs Consultant incurs in connection with canceling any secondary contracts it undertook in anticipation of performance of the Services and any other actual damages suffered by Consultant.

(b)     In the event Company terminates this Agreement pursuant to this Section 8, Consultant will be entitled to payment for all accepted Consultant Deliverables and any other Services rendered through the date of termination, including any other reimbursable expenses incurred by Consultant through the date of termination. In addition, Consultant may recover its actual damages incurred through the date of termination. Upon payment, Company shall be entitled to retain all Consultant Deliverables delivered to or for the benefit of Company pursuant to this Agreement through the date of termination, whether in electronic or other form, subject in all cases to Section 4.3 and excluding any and all Intellectual Property, Work Product, and Confidential Information of Consultant not subject to the license granted under Section 4.3.

8.5     Survival. The rights and obligations contained in Sections 3-6, 8, and 9-19 will survive any termination or expiration of this Agreement.

9.     INDEMNIFICATION.

9.1     Consultant shall indemnify, defend, and hold harmless Company and its officers, directors, agents, owners, and employees, for any claims brought or liabilities imposed against Company by Consultant or any of its employees or by any other party (including private parties, governmental bodies and courts), for claims related to worker's compensation, wage and hour laws, employment taxes, and benefits, and those matters relating to Consultant's status as an independent contractor or the status of its personnel. Subject to Section 10, indemnification shall be for any and all losses and damages, including costs and attorneys' fees.

9.2     Company shall indemnify, defend, and hold harmless Consultant, and its officers, directors, agents, owners, and employees, from and against any and all liability, claims, demands, damages, losses, causes of actions, costs and expenses, including attorney fees and costs, arising out of or in connection with (a) the operation of Company's business, (b) Company's use of the Consultant Deliverables, except for any claim by the Company that the Consultant Deliverables infringes the intellectual property rights of a third party, (c) Company's modification of any Consultant Deliverables, (d) the negligence or misconduct of Company, or (e) any breach of this Agreement by Company. Notwithstanding the foregoing, the foregoing shall not apply with respect to any such liability, claims, demands, damages, losses, causes of action, costs and expenses to the extent caused by the gross negligence or willful misconduct of Consultant.

9.3     A party seeking indemnification under this Section 9 must give the indemnifying party prompt written notice of the applicable claim or allegation and provide the indemnifying party with reasonable assistance in the defense or settlement thereof. The indemnifying party will have the right to control the defense and settlement of any allegation or claim for which it is required to indemnify the

8

other party, provided that the indemnifying party will not agree to a settlement that (i) imposes un-indemnified liabilities or fault on the indemnified party without the indemnified party's prior written consent (not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, if any claim is brought by a governmental authority claiming a finding or admission of a violation of any law, then the indemnified party shall be entitled to contest, defend, control, compromise and settle such claim.

10.    LIMITATION OF LIABILITY; WAIVER OF DAMAGES.  In no event shall the liability of Consultant arising out of or in connection with this Agreement or the Services exceed, in the aggregate, the total fees paid by Company to Consultant in the previous twelve (12) months for the particular Services or Consultant Deliverable with respect to which such liability relates (or in the case of any liability not related to a particular portion of the Services, the total fees paid by Company to Consultant under the applicable SOW in the previous twelve (12) months), whether such liability is based on an action in contract, warranty, strict liability or tort or otherwise. Consultant shall not be liable to Company or any Affiliate, or their respective owners, directors, officers, employees, agents or representatives, for any special, indirect, incidental, consequential, exemplary or punitive damages arising under or in connection with this Agreement, except to the extent paid to a third party (and not one of the aforementioned parties), even if Consultant has been advised of the possibility of such damages.

11.    NON-SOLICIATION.

11.1    During the term of this Agreement and for a period of one (1) year thereafter ("Restricted Period"), Company will not, and will cause their Affiliates not to (a) directly or indirectly induce or attempt to induce or otherwise counsel, advise, ask or encourage any individual who is at the time, or was at any time within the preceding six (6) months, employed by the Consultant or any of its Affiliates, to leave the employ of Consultant or its Affiliates or to accept employment with another employer or as an independent contractor or (b) offer employment to or retain the services of such individual, other than with the consent of Consultant. This Section 11.1 does not apply to an employee who becomes employed by the Company or an Affiliate of a Party as a result of a response by that employee to a public advertisement or normal recruitment procedures and not as a result of being approached or targeted by Company or an Affiliate thereof.

11.2    If Company desires to offer employment to any employee of Consultant during the Restricted Period, the Company shall make such request to Consultant in writing and shall offer to compensate Consultant no less than 30% of the first-year compensation package (including base and target bonus) for any such employee. Consultant shall then have a period of thirty (30) days to respond to Company to accept or decline such offers. In the event that Consultant does not respond to Company within such thirty (30) day period, Consultant will be deemed to have declined such offer.

12.    SUCCESSORS AND ASSIGNS.  Other than as permitted herein, Company shall not assign this Agreement or delegate any of its rights or obligations, in whole or in part, under this Agreement or any Statement of Work, by operation of law or otherwise, without the prior written consent of Consultant (which consent shall not be unreasonably withheld). As a condition to accepting any such assignment or delegation, Consultant may require a potential assignee and any Affiliates thereof to execute a nondisclosure agreement and/or a signature page to this Agreement. A valid assignee of Company authorized hereunder, including a valid assignee of a Statement of Work, shall be bound by the terms of this Agreement and shall have all of the rights and obligations of Company set forth in this Agreement; *provided*, that in no event shall the Consultant's consent be construed as discharging or releasing Company in any way from the performance of its obligations under this Agreement or any other

9

Statement(s) of Work to which Company is bound. Any attempted assignment in violation of this Section 12 shall be null and void and of no force or effect. Consultant may assign this Agreement without the consent of the Company in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of its assets . Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon each Party and their respective successors and permitted assigns.

13.     NOTICES.   All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, or if sent by the United States certified mail, return receipt requested, postage prepaid, shall be deemed duly given on delivery by United States Postal Service, or if sent by electronic mail or receipted overnight courier services shall be deemed duly given on the business day received if received prior to 5:00 p.m. local time or on the following business day if received after 5:00 p.m. local time or on a non-business day, addressed to the respective Parties hereto as follows:

|  | To Consultant | 3C Consulting, LLC |
|--|--|--|
|  |  | 2839 Wyandot St, Unit 1 |
|  |  | Denver, CO 80211 |

Tel: 303-542-7199

|  |  | Attn: Nic Easley |
|--|--|--|
|  |  | Email: n.easley@3ccannabis.com |

|  | To Company | Company Name:  Jeff Rehberger through TBF Entity |
|--|--|--|
|  |  | Attn:  Jeffery Joseph Rehberger |
|  |  | Street Address:  1147 W Ohio St - Ste 204 |
|  |  | City/State/Zip:  Chicago, Il 60642 |
|  |  | Phone Number:  618-410-1345 |
|  |  | Email:  jeffrehberger01@gmail.com |

or to such other representative or at such other address as such person may furnish to the other Party in writing.

14.     GOVERNING LAW.   This Agreement shall be governed by and construed in accordance with the laws of Colorado, exclusive of its choice of law provisions. The Parties hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located within the State of Colorado over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each Party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of an inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law. Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.

15.     WAIVER OF JURY TRIAL.   EACH PARTY HERETO ACKNOWLEDGES AND AGREES

10

DocuSign Envelope ID: 302E9563-A524-468B-9A5E-7DDCA85335BE

THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

16.     SEVERABILITY.  Whenever possible, each provision of this Agreement and any Statement of Work shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or any Statement of Work is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement or Statement of Work, as the case may be.

17.     AMENDMENT; WAIVER.   No modification, revision, supplementation, abrogation, termination, extension, waiver, or amendment to or of this Agreement, or any other agreement between the Parties, (including any attachments, exhibits or Statement(s) of Work) or any of its provisions, may be made, and any attempts shall not be binding, unless in writing and duly executed by the Parties (or by the waiving Party in the event of a waiver). A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation or warranty shall not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty, nor shall a delay on the part of any Party to this Agreement in exercising any right, power or privilege hereunder will operate as a waiver thereof. A waiver by any Party of the performance of any act shall not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

18.     INJUNCTIVE RELIEF FOR BREACH.   Notwithstanding anything to the contrary herein, because each Party may have access to and become acquainted with the Confidential Information, Work Product, and employees of the other and because such Party may not have an adequate remedy at law in the event of a breach of this Agreement, each Party shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond, and without prejudice to any other rights and remedies that such Party may have for a breach of this Agreement.

19.     ATTORNEYS' FEES.  In the event Consultant is the prevailing Party in any litigation relating to the subject matter of this Agreement, Consultant shall have the right to collect from Company its reasonable costs and necessary disbursements and attorney's fees incurred in enforcing this Agreement. Company shall pay to Consultant on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees, and expenses, and all other expenses which may be expended by Consultant to collect or enforce payment of any fees and costs due by Company to Consultant under this Agreement.

20.     ENTIRE AGREEMENT.   This Agreement and the Statement(s) of Work entered into in

connection herewith constitute the entire understanding of the Parties relating to the subject matter and supersedes any previous oral or written communications, representations, understanding, or agreement between the Parties concerning such subject matter.

21.    HEADINGS. The headings of sections herein are included solely for the convenience of reference and shall not control the meaning or interpretation of any provision of this Agreement.

22.    RULES OF CONSTRUCTION. Each of the Parties hereby agrees that it has carefully reviewed this Agreement and has had ample opportunity to seek legal advice and input. Consequently, the rule of construction that ambiguities and unclear phrases are construed against the drafting Party or in the light most favorable to the non-drafting Party shall not apply. Any matter set forth in a signed SOW describing in reasonable detail the actions to be taken by Consultant will be deemed to have been approved by the Company in writing for all purposes of this Agreement.

Signature Page Follows.

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the date first above written.

**3C CONSULTING, LLC**

Jeff Rehberger through TBF Entity

*Mc Easley*

3E3EEBC34445458...

*Jeffery Joseph Rehberger*

C09CDC96F6D844F...

BY: Nic Easley

BY: Jeffery Joseph Rehberger

ITS: CEO

ITS: President

DATE: 10/23/2019

DATE: 10/23/2019

13

**EXHIBIT A**
**Statement of Work**

# High-Level Strategic Direction

Our high-level strategic direction services and best practices will provide support in the following key areas (as needed):

- Formation Advice - Review of basic business structures and recommended strategies to avoid expensive formation pitfalls.
- Strategy Review - Assess existing goals, strategies, documentation, processes, and policies. This is especially important due to continually changing regulations and policies.
- Initial Finance Review - Analyze current financial documents and plans including corporate milestones, budget, and cash-flow needs.
- Construction Planning - Share guidance designed to avoid common errors through the planning, pre-construction, direct construction, and future expansion of physical sites to avoid costly redesigns.
- Banking and Finance - Develop strategies that legally maximize profits in light of IRC 280E constraints, banking challenges, and manage investor expectations.
- Partnership Options - Review and advise on joint venture opportunities and partnership best practices for strategic access to vendors and distributors.
- Product Guidance - Recommendations on types of products to distribute based on regulations.
- Business Model - Recommend business models based on best practices, compliance requirements, and business optimization goals.
- Marketing & Distribution - Initial review of marketing and distribution strategies with the potential for strong relationships in your market.
- Project Timeline - Review your project timeline to ensure it meets agreed upon deadlines and adjust as necessary.
- Operational Guidance - Evaluate your operational plan and procedures to provide best practices.
- Security & Compliance Review - Provide security compliance guidance, ensuring facility, staff, and visitor security in compliance with the regulations.
- Funding Estimates - Review and provide guidance for your funding plan.
- Additional Services - May be offered as necessary.

14

# Strategic Startup and Funding Articulation Documents

3C™ will tailor your articulation documents to tell your unique story to potential investors, regulatory officials, and the local community. This process begins with developing your business' Executive Summary, Financial Models, and an Investor/Corporate Pitch Deck. Throughout this phase, we will collaborate with your management team to ensure that they are ready to engage stakeholders in productive discussions, create accurate projections of your capital needs, and help estimate your company valuation. Our offer includes the following customized documents:

### Executive Summary
- Company Vitals
- Business description
- Problem/opportunity
- The solution, including unique offerings and intellectual property
- Industry benefits
- Business model
- Current company status
- Marketing/distribution
- Competition and SWOT analysis (Strengths, Weakness, Opportunities, and Threats)
- Local market size and potential
- 5-year financial summary
- Management team bios

### Five-year Financial Models (1 set of Management and Operational models with up to two iterations)
- Income statements
- Assumptions
- Cash flow
- Budget
- Gross profit
- Capital requirements

### Investor/Corporate PowerPoint Presentation (Up to 15 Slides)
- Introduction
- The problem
- The solution

15

- Your vision
- Market opportunity
- Competition
- Distribution model
- Financial summary
- Management team
- Company status (including capital requirements and use of funds)

## License Application Guidance

Our license application guidance will include the following services as applicable:
- A virtual kickoff meeting to define the license application plan (future interviews and consultation may be necessary depending on project development).
- Strategic planning guidance on each component of your operation focused on meeting application criteria.
- Research, review, and embed anticipated application requirements and associated laws.
- Continuous market research and competitive overview.
- Finalizing documentation generated during the Strategic Guidance phase of our engagement.
- Site design guidance for building plans including advice on conceptual building designs, operational designs, additional structure analysis, partnerships, and project plans.
- Develop operational designs, concepts, and strategies including operational models and flowcharts focused on efficiency, regulatory compliance, and best practices.
- Advise on developing staffing plans, control, and record keeping systems.
- Provide security, compliance, and regulatory guidance to ensure facility, staff, and visitor security are in compliance with regulations.
- High-level guidance for supply chain management, quality control, and distribution.
- Suggest and implement changes and revisions as needed, based on consultation with you and your team.
- Guidance on the Social Equity section of the application.
- Collaboration with your team on the content and written sections.

## Costs and Terms

All materials, information, documentation, and work product developed in our collaborative relationship are available for use only within this project scope. All materials, information, documentation, and work product developed will become your property, subject to the above restrictions on use, upon full payment of fees and expenses outlined below.

16

DocuSign Envelope ID: 392E9563-A524-4688-9A5E-7DDCA85335BF

This proposal is only valid through 24 October 2019.

> **Fee:** $10,000 per each dispensary applications for a minimum of 10 applications.
> **Success Fee:** $20,000 for each license awarded, due 30 days upon license award announcement, notification of pre-licensure qualification, or application progressing to the next round of application review or interview, whichever comes first.
> **Brand/Name Usage:** The Company will compensate Consultant to appear on the application (where 3C is listed to show you have a partner with current operator/license holder experience), 3% equity in each company filing an application, and each associated company, with an equity buyout option in the Operating Agreement for $20,000. This is in addition to the $20,000 success fee that would be due upon the license being awarded. The equity and buyout provision will be granted upon deciding to add the 3C to the application, at the Consultant's discretion. The 3C delivery team will determine which, and how many applications we will choose to be listed on after the project has started.
> **Expected Duration:** Through Application Submittal
> **Terms:** $50,000 wired upon execution of this SOW Addendum. $25,000 wired 45 days after the execution of the SOW Addendum. And $25,000 wired seven days prior to the application submittal deadline. Each additional application payment is due once the work begins.

Any additional expenses (travel and other items) are to be pre-approved per the terms of the MSA, and payable upon invoice.